The Clerk, please call the final case of the morning. 117-0435, Sysco Food Service of Chicago v. Micro-Documents. Counsel, you may proceed. Thank you, Your Honor. May it please the Court, Counsel, Peter Stoneropoulos on behalf of the appellants of Sysco Food Services of Chicago. While this case has a massive record and we have revams and various appeals, the question before this Court today is very simple. And that question is whether the October 24, 2012, Commission decision was against the manifest weight of the evidence. The answer to that question is no. On December 23, 2013, Judge Lopez-Sapiro misapplied the standard overview when he reversed and remanded the October 2012 Commission decision and he directed the Commission to award Mr. Donahue wage differential benefits under Section 81. Now, as I stand before you this morning, I can just say the full duty release in the record, the Petitioner's testimony that he can perform his usual and customary line of employment. The fact that he argues that throughout his briefs, all throughout all the appeals, combined with Dr. Walsh's opinions that the degenerative condition that he is not causally related to the work accident would be sufficient to support the Commission's decision on the manifest weight standard. And why do you feel it's not sufficient? Why are you undermining your own position? I'm not. I'm saying I could just say that. Yeah, I could say that. And that would be enough. And if you look at what Judge Lopez-Sapiro did, it is baffling to me. He, so I guess I could just say that and sit down. It's not good for me. Even though it is some time, so I might as well use it. It's not good for us. Go ahead. Okay. I have kind of boiled his order down to possibly three basings for the reversal. None of which seem to be proper. First one is a torture discussion of Ms. Gersh's testimony and whether she was credible. He thought that she wasn't. And if he were the trier of facts, perhaps he would have found it visibly. Unfortunately, that's not the standard. That's up to the Commission, not the trial court, right? Yes, exactly. Thank you. Besides that, what was in the mind of the employer when they were discussing what position they would offer him after he was released full duty from his work accident? It doesn't really matter. I have a feeling that if all these letters that counsel points out on the brief all said, because your accident is, because your condition is not work-related, we're going to put you in the guard shack, they would be making that up, saying that's a persuasive document. Second, Judge Lopez-Ferrero seemed to say that the Workers' Compensation Act did not require a physical reason for the partial incapacitation that resulted in the loss of earnings. So an employment decision, a loss of a job, an employer closes, so the claimant goes to work somewhere else making less money. Now, apparently under his order, all those things, if the claimant's earning less money afterwards, would entitle him to waste of financial benefits, even absent any medical incapacitation. And that's not the law. The partial incapacitation from the usual and customary line of employment must occur not only after accidental injury, but as a result of that accidental injury. So if you look through all the case law where they're assessing whether the accidental injury resulted in a loss of earning capacity, it's medical. Or, I guess, psychological, if it's a psychological injury. So to say that he had an accident, he came back to work making less money, therefore he's entitled to wage differential, is missing back that crucial factor in the analysis. Third, Judge Lopez-Sapero felt that Dr. Regan's June 7, 2011, letter should have been given more weight as it, quote, from his order, contains evidence that a petitioner could have used to further his case, end quote. So he looked at the letter. If he were to try our fact, he would have given it more weight than the opinions of Dr. Walsh. Again, unfortunately, not his place in that. Are you saying, in essence, he didn't follow the manifest weight standard? He substituted his judgment for that of the commission on weight and credibility? Is that, in essence, what you're saying? Yes. Okay. In conclusion, the October 24, 2012, commission decision is completely supported by the record, is not against the manifest weight of the evidence, and never should have been reversed by Judge Lopez-Sapero. The record shows the treater was released in full duty as a result of the accident. He testified he had no restrictions. He testified he had no symptoms. He testified he could do the job. He argued throughout his briefs that there's no reason he wouldn't be able to do his job. He was ready, willing, and able to do it. As a result of all that, it's our position that the 2013 order from Lopez-Sapero is erroneous. We ask that this Court reinstate the October 2012 commission decision and find that all subsequent decisions and orders are null and void. Thank you. You'll have time to reply, counsel. Thank you. Counsel, you may respond. Good morning, Your Honors. May it please the Court. Counsel Amy Lee Hogan-Simonovich on behalf of the appellee, Mr. Donohue. Counsel talked about Judge Lopez-Sapero's decision and how he reached his conclusions. The commission found that the treating physician was silent on the issue of the employee's degenerative condition of his left knee being related to the accident. As Judge Lopez-Sapero correctly points out, since the treating physician was most certainly not silent on that issue, no reasonable trier of fact could have reached that conclusion. So Judge Lopez-Sapero does follow the manifest weight of the evidence standards on that issue. Well, even if we accepted your argument was correct, that the commission was wrong in saying that the peer was silent, what gave Judge Lopez-Sapero the authority to then decide the case on his own? He comes up with a profound statement. There is no language in Section 8D1 that requires a claimant to be medically incapacitated to receive a weight differential. That's utter nonsense. 8D1 says that an injured employee is entitled to a weight differential if, as a result of a work-related accident, he becomes partially incapacitated. Well, I would answer Your Honor's question in two parts that I would like to address. And the first is... The fact that the employer said they weren't going to take him back as a truck driver didn't mean that he was incapacitated from performing his customary line of employment. It just meant they weren't going to take him back. Well, the employer's representatives actually state that they are not taking him back as a result of safety concerns, as a result of his work-related injuries. No question except for one problem. He said, I'm capable of working. There's medical evidence in the record that says he's capable of driving a truck. The employer says, I don't care what that says. We've got safety concerns. We're not taking this guy back. He had other physical problems that weren't related to the accident, didn't he? So I would first like to address your question by directing your attention to the Derby case because you're asking about whether or not a medical restriction is required. And I want to compare the facts. No, medically incapacitated. He said there's no requirement that he be medically incapacitated. How would a person be incapacitated other than medically? Sure. So in Derby, and similarly in this case, it was vocational evidence that was brought in to talk about why the claimant could not return to that job. So in Derby, that was before this court, the claimant was also not under any medical restrictions from the suing physician. There was a vocational rehabilitation counselor who did job simulated testing and found that he may have difficulty with strength and endurance to tolerate his job activities and that it was best that he pursue his ministry goals in the seminary. Nonetheless, the treating physician reviewed the simulated job activities and said he should try to return to his usual and customary employment as a repairman. He placed no physical restrictions on the claimant. Now in denying the claimant wage differential benefits in Derby, this court looks not to the lack of medical restrictions from the treating physician, but to the fact that he did not demonstrate a loss of earning capacity since he chose to pursue a lower-paying job in the ministry versus using his past history of computer skills to find a higher-paying job. So as you know, to qualify for a wage differential under Section 81, we have to prove partial incapacity and we have to prove an impairment of earnings. In Derby, that first prong is satisfied. Benefits are denied under the second prong. So similarly, in this manner, you have an employee who participated in a fit-for-duty test that also raised endurance concerns. It found he was capable of performing job-specific tasks he was tested for, but Justice in Derby raised some endurance concerns about whether he could perform those over a full day and he may need to be transitioned into a full day. Nonetheless, on November 18, 2010, following that fit-for-duty test, the treating physician opines that he could function at a reasonable level and should return to regular activities as a truck driver. So Justice in Derby, we have job-simulated testing raising concerns of strength and endurance. A treating physician releases back to work. In Derby, it was a vocational counselor who raised concerns against the return to work. In our case, it's a safety manager, an occupational health manager, an HR specialist who insisted that they had safety concerns that he not return to his usual and customary employment. So my argument is under these facts, Justice in Derby, we move right to the second prong of the analysis. The first prong is satisfied as to partial incapacity by these vocational... Does the incapacity have to be the result of a medical condition? The same concerns as in Derby... Why don't you answer my question? Does the incapacity have to be because of a medical condition? In Derby, it was... Answer that, and it's a yes or no answer. As a proposition, does it have? It has to be as a result of the work accident. It has to be a result of an injury. Correct. That's a medical injury, a physical injury. A medical injury has to concern, it has to occur that raises these safety concerns that he then... No, no, not raises safety concerns. Let's not confuse why the employer didn't take him back with the question of whether he was incapacitated  That's a difference. The employer doesn't have to take him back whether they like him or dislike him, whether he's safe here or not. The question is, was he medically incapacitated from performing the job of a truck driver? And the employer decided that he was incapacitated. The employer decided that... Excuse me, ma'am. The employer does not decide medical issues. Doctors decide medical issues. And you've got a little bit of a problem with your own client, because he confessed on the stand during the arbitration, he was as good as he was before the accident ever happened, and he could do the job. So now the question becomes, when the party confesses to being as good as he was before the accident, and he can do the job, isn't that an admission against interest that binds him? I don't think it is, because I think the real admission against interest here is the employer's representatives all disclosing that because of the condition of his left knee from his work-related accident, they did not feel he should return to work as a truck driver. That's right. They didn't believe that. But the question is, what do the doctors say? Do the doctors say that he's medically incapacitated from driving a truck? Who said that? No, his doctor releases him to return to regular activities, just as in Derby. Well, wait a minute. This is the doctor who says, you can go back to work, you can drive a truck. He says, I can go back, I can drive a truck. The employer says, I have some safety concerns based upon the injury to your knee, and you're suggesting that's sufficient to award him to make a determination that he's partially incapacitated from performing his occupation? It was the same safety concerns in Derby that allowed the court to decide that a partial incapacitation occurred, but that he did not meet the requirements. Let me ask you a pointed question. Sure. In Derby, did the claimant get on the witness stand and said, I'm fine, I'm better than I was before the accident? Did the claimant say that in Derby? You have a little bit of a twist here, because you want to ignore your own. Who would know better about their own physical condition in any case that comes before it than the claimant? If the claimant says they're absolutely fine, you're supposed to ignore that and say, really, these tests know better than you know. Well, the claimant really wanted an opportunity to be given a chance to try to return to his job as a truck driver. Well, his subjective motivation is notwithstanding. He said he was perfect, however, he's ready to go, he's fine. He wanted to return to his job as a truck driver. No, he said he was as good as he was before the accident. That's what he said. That's not in the mix? We don't consider that? Well, I think the problem with considering that is the commission, if we look back to what exactly the basis for the commission's decision was. So if the commission finds, I'm sorry, let me just flip to the correct page. The commission finds that the reason they could not award an 81, the reason they had to award under AE, was for reasons unrelated to the work accident. The petitioner was offered a position in the guard shack to prevent future injury to himself or others and to diminish the progression of his unrelated degenerative condition of the knee. The record is devoid of any evidentiary support for that conclusion. Where is the support for the conclusion that he's being put in this position because of his degenerative condition? July 31st of 2010, Dr. Walsh examined the claimant. He issued a report on that day. He opined that the claimant was able to return to work without restrictions as a result of his work-related injury. He did note that the claimant had a degenerative condition of the knees which was not caused or aggravated or accelerated by the work. The commission couldn't believe that, Dr. Walsh? Well, here's the problem with Dr. Walsh. The commission did not accept Dr. Walsh's opinion as to causal connection of the meniscus tear. Dr. Walsh actually finds that there is no causal connection for the meniscus tear, which the commission feels there was causal connection for. Dr. Walsh finds that there's some significant degenerative condition, but as you pointed out, we have an employee here who says he has no pain and he wants to go back to work. No, he said he was as good as he was before the accident. That doesn't mean he didn't have any pain. And here's my other problem with Dr. Walsh's report. If you look at his second report on November 23rd of 2010, he states that if the patient suffered an acute injury to his knee that resulted in contralateral damage to the articular surface, he would have had swelling and an effusion in his knee. Well, there is, in fact, bruising and swelling noted in the physicians' and media care records on the day of the accident, and then there's an MRI that objectively documents the effusion in the knee that Walsh said he needed to have. So you would suggest that they rejected Walsh on that? They rejected Walsh on the basis that we did not enter a contrary opinion by Dr. Reagan, which we did. It is something that the court keeps neglecting to read the full statement from Dr. Reagan's letter of June 7th, 2011, wherein he states, I do believe the accident caused the meniscal pathology, the bone bruise, and probably aggravated pre-existing chondromalacia. So the commission's findings in this case— What else did he write? Why don't you finish the quote? The quote is finished in— No, it's not. No, it's not. Whether or not degeneration is related to the aging process or an accident on the job, I have a more difficult time saying one versus the other. Correct, and all I'm asking, Your Honors, is that that statement be read as a whole because it's contrary to the findings of the commission that Dr. Reagan is silent on the issue. If you read both sentences and you read Dr. Reagan's letter as a whole, you cannot possibly say, as the commission found, that Dr. Reagan was silent on the issue. It's disgusting not to read both sentences together. On which issue? On the issue of chondromalacia? On the issue of aggravation of the degenerative condition. That is the basis for the commission's finding. Dr. Reagan is silent on the issue. And they're ignoring the sentence proceeding to the one that Justice Hoffman just read. It needs to be read as a whole. I believe that the accident caused the meniscal pathology, bone bruise, and probably aggravated a preexisting chondromalacoma. As to whether the claimant's degenerative condition is causally related to the work injury, he writes, whether or not degeneration is related to the aging process or the accident on the job, I have a more difficult time saying one versus the other. This man never, the commission evidently interpreted the second sentence as saying, it's possible, but I'm not going to say within a reasonable degree of medical certainty that it was in fact done. So they turned around and said there was no contrary opinion. No definitive evidence one way or the other. And Shapiro turns around and accuses them of totally ignoring it in a subsequent decision where they took umbrage with his comments and they should have. Their decision of October 28th, they said that in arriving at the original decision, they did consider that letter and they accorded it no weight. So they've answered the question as to whether they considered it or they didn't. And in this particular case, Walsh opined again, November 23rd, 2010, that the claimant did not require work restrictions like his accident and it would be reasonable to restrict him from work as a truck driver due to his degenerative knee condition, which is unrelated to his work accident. Well, if he has a degenerative knee condition, wouldn't Cisco be within its, you know, its rights as an employer to say, you know, with that condition, we've got some safety concerns here. We're not going to give you your job back. And the degenerative condition that we're talking about here, Your Honor, is the chondromalacia. It is whether that chondromalacia of the medial femoral condyle was aggravated by this fall. And as I said, in that report from Dr. Walsh that you just quote from November 23rd, he said that the chondromalacia would be related if there was an effusion in the knee. Now, we have an MRI from 12-2809 where one of the findings is effusion in the knee. So Dr. Walsh's opinion doesn't make any sense that this chondromalacia, this degenerative chondromalacia is unrelated to the accident. He himself admits if there's effusion, it's related. And there's effusion. You keep signing. Thank you. Thank you, counsel, for making your argument. You may reply if you would answer that last question. Well, you know, Walsh would say if there's effusion, then there's aggravation, right? He did say that. Okay. And then we've got somebody saying there's an MRI that's being read that there's effusion. It shows that there's effusion. Yeah. So turning our attention to the line of cases about temporary aggravations versus permanent aggravations, we have a claimant who got on the stand and said he was as good as new. So we can't stand here and pretend that if there was an aggravation, that it was permanent. He said he was symptom-free. He said he had no pain. He said he could do the job. He had a full-duty release. There could not be a permanent aggravation of an underlying degenerative condition if he's symptom-free at the time of trial and after he's released from care as a result of this work-related injury. Throughout the course of this treatment, they identified a latent degenerative condition that, by his own admission against interest, wasn't effective at trial, and he could have done this job. And, you know, as Justice Hoffman pointed out, it was not incumbent upon my client to take this man back given their safety concerns. If he wanted to drive a truck, he can go drive a truck. He can go work somewhere else and drive a truck. I mean, we're not the only employer in Chicago that employs truck drivers. If that's what he wanted to do, he certainly fell within his rights to do it. He felt he could do it. CISCO's testing showed there was a latent degenerative condition that would continue to progress over time, and they didn't want it to result in a semi-crash or what have you. Well, seriously? You're serious about that, that that's a safety concern? That was, I believe, one of the safety concerns. Can you give me the mechanism of injury that degenerates at the time of the violation as a safety concern? Yeah, it's... What happens? Because they're held to a high standard because they operate these types of vehicles, they have to... I'm probably going outside the record here. Well, I know because I'm just... They have to not only keep in mind the danger to the individual, but safety concerns for the general public. I'm asking, okay, what's chrondomyelitia? It's a degenerative arthritic condition. In the leg, right? It can be anywhere. Okay, because in this case, it's in which knee? In the left knee. In the left knee. Okay. How is that? It's a clutch. If his knee goes out, I don't know. I don't either. I think safety is the biggest risk here. And maybe so, but under the Act, if he thought that he was incorrectly terminated, he would have other recourses. Under the Act, he's entitled to benefits that stem from the medical... Despite what Lopez-Farrell thought, there was no medical incapacitation that prevented him from doing his job. Counsel talked about the Dirty Case. Mr. Donahue presented no evidence that that job in the car shed reflected his or her incapacity. He didn't call a vocational specialist. His own testimony was that he would do the job and make as much money as he was making before. He can go work somewhere else and make as much money as he was making before, as he did in the car shed. So when you fail the first prong of medical incapacity and then don't present any evidence to show that what you are earning in the car shed represents your earning capacity post-accident, you fail both prongs. So that being said, I ask that this commission please vacate the order... This court. I'm sorry, this court. Yes, definitely this court. Vacate the 2013 Lopez-Farrell order and reinstate the counsel's qualification position. Thank you. Thank you, counsel, both, for your fine argument. This matter will be taken under advisement. This position shall be issued, and the court will stand in recess subject to call.